1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8   FEDERAL TRADE COMMISSION, et al.,

9          Plaintiffs,

10          v.

11   DEBT SOLUTIONS, INC., et al.

12          Defendants.

13
14

CASE NO. C06-298JLR

FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
PRELIMINARY INJUNCTION

15
16

## I.  INTRODUCTION

17          This matter initially came before the court on the *ex parte* motion of the Federal

18   Trade Commission ("FTC")[1] for a temporary restraining order (Dkt. # 4).  On March 7,

19   2006, the court denied the motion because it found no basis for granting *ex parte* relief.

20   The FTC then served Defendants with its motion papers, and requested that the court

21   consider its request for a temporary restraining order on an expedited basis.  On March

22   13, the court ordered Defendants to respond to the FTC's request for injunctive relief by

23   March 24.  After receiving Defendants' response, the court held a hearing on March 27 to

24   discuss the pending request for injunctive relief.  The parties agreed at oral argument that

25
26

27          [1]Although the State of Washington is also a Plaintiff and a party to the instant motions, the
28   court will refer solely to the FTC.

FINDINGS & CONCLUSIONS - 1

the court could treat this matter as a request for a preliminary injunction, provided that the parties reserved the right to move to modify any resulting injunction.  The court thus takes up the question of whether the FTC is entitled to a preliminary injunction, and on what terms.

## II.  FINDINGS OF FACT

1.  The FTC is an agency of the United States authorized to seek redress for violations of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §§ 41-58.

2.  Defendant Debt Solutions, Incorporated is a Florida corporation engaged in the telemarketing of a purported consumer debt relief program.

3.  Defendant DSI Financial, Incorporated is a Florida corporation affiliated with Debt Solutions, Incorporated, also engaged in the telemarketing of a purported consumer debt relief program.

4.  Defendant DSI Direct, Incorporated is a Florida corporation affiliated with Debt Solutions, Incorporated.

5.  The differences between the corporate Defendants identified above are not apparent from the record.  For purposes of this order, the court will refer to them collectively as "DSI."  DSI also conducts business under the name "Accelerated Financial."

6.  Defendant Pacific Consolidation Services, Incorporated ("PCS") is a Washington corporation with a contractual relationship with DSI.  PCS also does business as DSI Financial, Inc. and Accelerated Financial, Inc.

7.  Defendant Kenneth Schwartz is the principal officer of DSI.  He resides in Florida.

8.  Defendant Jennifer Whalen is the principal officer of PCS.  She resides in Washington.

9.    Defendant David Schwartz is the PCS manager responsible for the entity's day-to-day operations.  He resides in Washington.

10.   Defendant Greg Moses is a PCS employee residing in Washington.

11.   DSI and PCS are engaged in the telemarketing of a consumer debt relief service. DSI contracts with call centers in various locations who make initial contact with potential customers.  Although it is not clear which call centers remain in operation, as recently as 2005 there were call centers in Florida, Georgia, and the Philippines.

12.   DSI telemarketers[2] make initial contact with potential customers.  The FTC refers to these telemarketers as "fronters."  According to a script that DSI or PCS provided in November 2005, the fronter briefly tells the customer that PCS can lower the customer's credit card interest rates by negotiating with their creditors. The fronter also tells the customer that DSI will provide a plan to help the customer eliminate their debt more quickly.  For customers interested in the service, DSI requests a credit card number to determine if the customer qualifies for the DSI service.  The only "qualification" for the DSI service is a credit card in good standing with sufficient credit to pay for the DSI service, although the fronter does not say as much to the customer.

13.   Once a customer has shown interest in the DSI service and "qualified," the fronter transfers the customer to another DSI telemarketer.  The FTC refers to this telemarketer as a "closer."  Closers guarantee customers that DSI will save them at least $2500 on their current debts, including but not limited to credit card debt.

---

[2]It is not clear from the record whether DSI's telemarketers work for one of the corporate entities or for independent entities with whom DSI contracts.  For purposes of this order, the distinction is not relevant.

FINDINGS & CONCLUSIONS - 3

14.  Closers inform customers that DSI will negotiate with their creditors to obtain reduced interest rates. The record shows that closers make specific claims about the interest rates they can obtain. In an April 5, 2005 call from an FTC representative posing as a customer, a DSI closer told the representative that while the "average" rate on his credit cards was "about 14.45" percent, DSI "could probably get you just around a 6.9 right now." The closer stated that "[t]here's no guarantee on the rate we're going to give you today because, of course, if I can get you lower than the 6.9, I'm going to do so." When the representative asked if that rate "should be about what I should expect?" the closer responded: "Yes, just around that – yes. And, actually, if we don't get it – if that's all we get it to the first time, DSI will go back in every three to six months and renegotiate on your behalf per your request." Later in the call, the closer told the representative that DSI could "get you as low as 3.9" percent.

15.  DSI closers explain to customers that if they purchase DSI's product and provide a schedule listing their current debts, a DSI financial consultant will negotiate for lower rates, and then prepare a personalized financial plan for the customer. The plan instructs customers how much money to pay on which debts, and includes the customer's total savings over the life of the plan.

16.  DSI sells its service for between $400 and $700, and charges the fee to the customer's credit card immediately after a successful telephone solicitation.

17.  If a customer agrees to purchase the DSI service, the closer transfers the customer to a call verification center. PCS formerly operated a DSI call verification center in Spokane, Washington, and now operates one in Federal Way, Washington.

18.  Although calls with fronters and closers are unrecorded, customers consent to the recording of their conversation with the DSI verifier. The verifiers make at least

FINDINGS & CONCLUSIONS - 4

two promises:  a guarantee of $2500 in savings and a guarantee that the customer will get out of debt three to five times faster without paying more money.  In describing the process of negotiating with the customer's creditors, the verifier almost invariably uses the following phrase:  "We cannot guarantee how low your rates can go or if any today, but we'll certainly do our best to get them as low as possible the first time."

19.   If the customer expresses an unwillingness to go forward with the transaction, the verifier transfers the customer back to a closer, who has an additional unrecorded conversation with the customer.  After that conversation, the closer returns the customer to a verifier.  In transcripts of several verification calls in the record, the customer is bounced between the closer and verifier several times.

20.   Depending on the state in which the customer resides, the verifier informs the customer of their right to rescind or cancel their purchase under state law.  The verifier explains that beyond any applicable statutory right to cancel, DSI does not offer refunds unless they are unable to give the customer more than $2500 in savings.

21.   The record demonstrates that DSI's marketing practices have misled customers.  A dozen DSI customers provided declarations stating variations of the same themes:  they believed that DSI would lower their interest rates substantially, whereas DSI lowered their rates marginally or not at all; they discovered that their personalized financial plan was little more than advice to pay more money on their debts each month and to make higher payments on debts with higher interest rates; and they had little or no success obtaining a refund from DSI when they expressed their dissatisfaction.

FINDINGS & CONCLUSIONS - 5

22.   Some customers complained that they were misled into believing that DSI would not immediately charge one of their credit cards for the cost of the DSI service.

23.   Some customers who declined to confirm their purchases while speaking with a DSI verifier were transferred back to DSI closers who instructed them to ignore the verifiers, then transferred them back to the verifiers to confirm their purchase.

24.   The court finds that DSI's telephonic representations regarding the plan it provides are likely to mislead customers.  One customer also submitted a copy of the "Debt Elimination Plan" that DSI provided.  The court finds that the plan's "accelerated payment plan" is deceptively different from the plan DSI representatives describe over the telephone.  It shows that customers will save on interest charges by paying more than the required minimum payments on their debts.  By setting an artificial total monthly payment for all debts, assuming that the customer can make the same total payment over the life of the plan, and assuming that the customer incurs no more debt, the plan purports to show that customers will pay off debts much more quickly than if they merely made minimum payments.  By contrast, DSI representatives tell customers on the telephone that they will be "completely debt free approximately three to five times faster without having to make any larger monthly payments than you are now."  DSI representatives make this statement despite having no idea what the customer's current monthly payments are, and without having any idea how quickly the customer will pay off his or her debts.

25.   The court finds that DSI's telephonic representations to customers are likely to mislead them about its ability to obtain interest rate reductions.  DSI is sometimes successful in negotiating interest rate reductions on some debts, although in many cases the reduction is minimal.  The customer declarations show, however, that

FINDINGS & CONCLUSIONS - 6

they are led to expect significant rate reductions, and in many cases have been led to expect specific rates that DSI does not deliver.

26.   To the extent that customers focus on the DSI financial plan instead of DSI's promises of lowered interest rates, they often report that they were led to expect a valuable debt elimination service, when in fact they received little more than the common sense advice that if they pay more money, they will eliminate debt more quickly.

27.   Some customers stated that DSI representatives had told them that DSI had an endorsement or recommendation from the Better Business Bureau.  DSI has no such endorsement.

28.   Representatives from the Registered Financial Planners Institute and the Canadian Financial Planners Standards Council have requested that DSI cease its practice of falsely informing customers that DSI or its software have endorsements from their institutions.

29.   In August 2004, the State of Washington resolved a lawsuit against many of the Defendants in this action by entering into a consent decree.  The decree contains a permanent injunction and a suspended penalty payment of $200,000.

30.   In the summer of 2005, PCS closed its DSI call center[3] in Spokane and terminated most of its employees.   Several of those employees provided information to the Office of the Attorney General in Washington.  The employees confirmed that they were encouraged to use promises of lower interest rates to induce customers to purchase the DSI service.  They were encouraged to make these promises

---

[3]DSI Direct may have operated the call center.  For purposes of this order, the court finds no relevant distinction between PCS and DSI Direct.

FINDINGS & CONCLUSIONS - 7

1    regardless of what debts the customers held.  For example, even if the customer
2    held credit cards from companies that had a policy of not negotiating lower rates,
3    DSI representatives would promise lower interest rates.  The former employees'
4    testimony confirms that the telemarketing practices of DSI and PCS mislead or
5    deceive customers, and that the Defendants encourage or are recklessly indifferent
6    to the misleading representations.

31.   In March 2006, Canadian Border Patrol agents stopped Defendant David Schwartz
      as he attempted to cross the Canadian border in Washington with a U-Haul truck
      filled with business equipment.  Mr. Schwartz explained that he was setting up a
      debt relief service in Canada.  Canadian officials determined that he lacked the
      proper permits to set up a business, denied him entry to Canada, and referred him
      to United States border agents.  Those agents searched Mr. Schwartz's vehicle and
      seized business records.  Other than a cursory description of the search, there is no
      evidence in the record regarding what the agents obtained from Mr. Schwartz.  At
      oral argument, counsel for the FTC stated that it had not reviewed the records,
      even though they urged the court to grant emergency relief based on their contents.

32.   Although the FTC admits that it has no idea what items were seized from Mr.
      Schwartz's U-Haul, it insists that Mr. Schwartz's attempted entry into Canada is
      evidence that the Defendants are fleeing the United States and expatriating assets.
      The court finds this assertion unconvincing.  Although Mr. Schwartz apparently
      attempted to expatriate physical corporate assets of PCS to Canada, the FTC has
      fallen well short of demonstrating a larger scheme on behalf of the Defendants.

33.   Defendants provide evidence that they are working with a Canadian attorney to
      obtain proper permits and licenses to operate a business in Canada.  They also

FINDINGS & CONCLUSIONS - 8

provide evidence that Mr. Schwartz successfully crossed the border on two previous occasions with shipments of business equipment.

34.    The court finds substantial evidence that Defendants Kenneth Schwartz, Jennifer Whalen, and David Schwartz are aware of the business activities of DSI and PCS. The court finds it likely that they directed the DSI business practices described above, or at least were aware of those practices or recklessly indifferent to them. The FTC has provided comparatively little evidence regarding Defendant Moses, and no evidence of his role with the company since 2005.

35.    The FTC initially asserted that Defendants had violated laws that implement the national "do-not-call list" for persons who do not wish to receive telephone solicitations. The FTC appears to have retracted those allegations, and they play no part in the court's decision today.

### III. CONCLUSIONS OF LAW[4]

1.    The court has subject matter jurisdiction over this action pursuant to, inter alia, 28 U.S.C. § 1331 and 15 U.S.C. § 45.

2.    Under the FTCA, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce" are unlawful. 15 U.S.C. § 45(a)(1).

3.    The FTC has authority to seek injunctive relief whenever it has reason to believe that a violation of any provision of the FTCA is occurring or is likely to occur and that enjoining the violation is in the public interest. 15 U.S.C. §§ 53(b)(1)-(2). The FTC need not post bond for an injunction. Id.

---

[4]In an effort to make the basis for its conclusions of law more clear to the parties, the court has included some subsidiary findings of fact along with the conclusions they support.

FINDINGS & CONCLUSIONS - 9

4.  When the FTC seeks injunctive relief under the FTCA, it need not satisfy the traditional requirements for injunctive relief.  FTC v. Affordable Media, Inc., 179 F.3d 1228, 1233 (9th Cir. 1999) (citing FTC v. Warner Communications, Inc., 742 F.2d 1156, 1159 (9th Cir. 1984)).  In particular, it need not demonstrate irreparable harm.  Id.

5.  Before awarding injunctive relief under the FTCA, the court need only determine the likelihood that the FTC will ultimately succeed on the merits and "balance the equities" to determine if an injunction is in the public interest.  Id.

6.  In determining the FTC's likelihood of success on the merits, the court notes that injunctions under the FTC are available when a defendant "is violating, or is about to violate" the law.  15 U.S.C. § 53(b).  The court finds it likely that the FTC will succeed in proving that the Defendants have violated the FTCA in the past.  The FTC has provided evidence that, as recently as the summer of 2005, the Defendants' unfair, deceptive, and misleading conduct was ongoing.

7.  The FTC has provided little or no direct evidence, however, that the Defendants are violating or will violate the FTCA in the future.  As the court noted in its prior order, the vast majority of the FTC's evidence focuses on conduct in 2004 and early 2005.  Of the twelve DSI customers who provided declarations to the FTC, only four had their initial conversations with DSI telemarketers after the entry of the August 2004 consent decree.  The FTC attempted to remedy this deficiency by providing additional evidence (Dkt. # 21) on the day before Defendants' response to their motion for injunctive relief was due.  Given that the FTC had unlimited time to prepare its motion for injunctive relief, the court finds no basis for its extreme delay in providing this evidence.  The delay caused obvious prejudice to

the Defendants, in that they had no time to respond to the new evidence.  The court therefore declines to consider the evidence at this time.[5]

8.    Although the record lacks direct evidence of ongoing unlawful conduct, the court infers that because Defendants continued to engage in unlawful conduct after they entered a consent decree that permanently enjoined such conduct, there is reason to believe that they continue to engage in such conduct.

9.    Defendants could have countered the above inference by presenting evidence that their business practices are different than those reflected in the evidence that the FTC provided.  They did not.  Indeed, they submitted very little evidence about their business practices, other than blanket assertions from Kenneth Schwartz and Ms. Whalen that they were not deceiving customers.  These blanket assertions are unconvincing in light of the evidence of their past business practices.  If Defendants wish to demonstrate that they are no longer engaging in deceptive conduct, they should present evidence that demonstrates their current business practices.  For example, Defendants could provide transcripts of customer telephone calls in which DSI representatives do not make deceptive or misleading statements.

10.   Kenneth Schwartz provided evidence countering some of the assertions of each of the customers who submitted declarations on the FTC's behalf.  In each instance, he attempts to show that DSI provided a service to each customer, and that each customer submitted to a recorded verification of their purchase in which he or she purported to understand the bargain he or she had struck.  This evidence, however,

---

[5]The FTC reserved the right to call Doris Schoenberg, an Idaho resident and recent recipient of a telephone solicitation from DSI, as a witness at the March 27 hearing.  The FTC declined to do so.

FINDINGS & CONCLUSIONS - 11

is insufficient in this court's eyes to overcome each customer's critical assertion: that DSI's solicitation methods misled or deceived them.

11.   The court concludes that the FTC has shown that it is likely that the Defendants are violating and will continue to violate the FTCA.

12.   In balancing the equities of an injunction, the court notes that the injunction it contemplates would require the Defendants to do no more than follow the law. From the evidence presented, it appears that following the law will likely require Defendants to make substantial modifications to their business practices. Although these modifications will no doubt impose a burden on the Defendants, it is manifestly equitable to require them to submit to the burdens of the law. Requiring telemarketers to comply with the FTCA is in the public interest.

13.   The court finds no equitable considerations mitigating against injunctive relief.  If the court were applying traditional standards for injunctive relief, it would find that the FTC's delay in bringing this action to court mitigates sharply against a finding of irreparable harm or urgency.  It would also find that because the consent decree appears to impose the same obligations that the FTC seeks to impose in this forum, the FTC has not shown that irreparable harm would result absent a federal injunction.  Traditional standards, however, do not apply when the FTC seeks an injunction based on violations of the FTCA.[6]

14.   The above findings and conclusions apply equally to the individual and corporate Defendants, with the exception of Greg Moses.  An individual is personally liable

---

[6]Although the FTC and the State of Washington allege violations of Washington law in this action and in their motion for injunctive relief, the court has not discussed those allegations, because the FTCA's relaxed standard for injunctive relief does not apply to them.  Accordingly, this order has focused exclusively on alleged violations of the FTCA.

FINDINGS & CONCLUSIONS - 12

1
2
3
4
5
6
7
8
9

for corporate misconduct if he or she "had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." Affordable Media, 179 F.3d at 1234 (quoting FTC v. Publishing Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1996)).  Under this standard, the court concludes that the FTC is likely to demonstrate that the individual Defendants, with the exception of Mr. Moses, are personally liable for the unlawful conduct described above.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

15.  In addition to injunctive relief prohibiting the Defendants' unlawful business practices, the FTC seeks a draconian freeze of all assets of all Defendants, with no exceptions.  The FTC suggested at oral argument that it would reach an agreement with Defendants permitting them to make payments in the ordinary course of business, but no such agreement is reflected in the FTC's proposed order.  In order to obtain an asset freeze, the FTC must show that it is likely to succeed on the merits of its action, and that there is a "possibility" that the Defendants may dissipate assets.  Federal Sav. & Loan Ins. Corp. v. Sahni, 868 F.2d 1096, 1097 (9th Cir. 1989).  Because Congress did not provide for an automatic asset freeze for violations of the FTCA, the court holds that to show a "possibility" that a Defendant will dissipate assets, the FTC cannot rely on conjecture.  Instead, Defendants must offer evidence specific to the Defendant that reveals a possibility that the Defendant will dissipate assets.

25
26
27
28

16.  On this record, the only evidence showing a "possibility" that Defendants may dissipate assets is that PCS has sent some physical business assets to Canada.  This is direct evidence that Defendants are dissipating physical assets, and gives rise to an inference that they have or will dissipate financial assets as well.

FINDINGS & CONCLUSIONS - 13

17.  Because PCS and DSI are closely intertwined, the above evidence demonstrates a possibility that the corporate Defendants in this action will dissipate assets absent an asset freeze.

18.  By contrast, there is no evidence of the possibility that the individual Defendants will dissipate assets.  At best, the FTC surmises that because the individual Defendants are accused of violations that could subject them to substantial liability, they will dissipate assets.  If this were sufficient to establish a "possibility" of dissipation, then every defendant subject to an injunction under the FTCA would automatically be subject to an asset freeze.

## IV.  ORDER

Based on the foregoing findings of fact and conclusions of law, the court orders that an injunction shall issue as set forth at the conclusion of this order.  The injunction is subject to modification on proper motion from either the FTC or Defendants.  The court notes, however, that it expects both parties to provide up-to-date evidence to support any motion to modify the injunction.

Discovery in this action shall commence immediately.  The parties have expressed interest in an expedited resolution of this action.  The court directs the parties to meet and confer within 10 days to discuss an appropriate process for expediting the action.  If they are unable to agree on a process, they may submit motions of no more than 10 pages setting forth their proposals.

The court DENIES Defendants' motion to strike the FTC's untimely evidence (Dkt. # 31), because the motion is improper under Local Rules W.D. Wash. CR 7(g). The court notes, however, that it has not considered the FTC's untimely evidence.  The court also DENIES Defendants' recent motion to deny injunctive relief and to dismiss the

FINDINGS & CONCLUSIONS - 14

individual Defendants (Dkt. # 37).  The motion contains no evidence or authority warranting relief.

## V.  PRELIMINARY INJUNCTION

For purposes of this preliminary injunction, "Defendants" means all Defendants named in this action with the exception of Greg Moses.

1.      All Defendants, their agents, and their employees shall cease the following conduct in telephone and written solicitations of customers:

        a)      stating specific interest rate reductions that they might obtain on behalf of customers (e.g., 6.9%, 10%, "cut in half," etc.);

        b)      claiming to be able to eliminate customers' debt "three to five times faster," or promising any specific acceleration in the customer's debt reduction, or promising that the DSI service will accelerate debt relief (as opposed to stating that the DSI service *may* accelerate debt relief);

        c)      claiming that customers will eliminate their debt more quickly without increasing their monthly payments; and

        d)      claiming that DSI has been endorsed by any entity unless that entity provides DSI with explicit written consent after the date of this order to claim the endorsement in telephone or written solicitations.

2.      All Defendants, their agents, and their employees shall make the following disclosures to customers during telephone or written solicitations:

        a)      that DSI may not be able to reduce any of their interest rates;

        b)      that some creditors will not negotiate rate reductions; and

        c)      that DSI cannot guarantee any amount of savings until receiving information on the customer's debts and payments.

FINDINGS & CONCLUSIONS - 15

3.    All Defendants, their agents, and their employees shall disclose DSI's refund policies to any customer who purchases the DSI service.  If, beyond any state-mandated rescission or cancellation period, refunds are available only at the discretion of DSI, DSI must disclose as much.

4.    It shall be a violation of this injunction if any Defendant causes any person or entity under his direct or indirect control to solicit the DSI service in a manner inconsistent with the previous paragraphs of this injunction.

5.    No *corporate* Defendant may transfer, spend, encumber, or pledge any assets without either the consent of the FTC or, if the FTC refuses consent, an order from the court.  The court may impose sanctions on the FTC for any unreasonable refusal to allow the corporate Defendants to make expenditures in the ordinary course of business.  The FTC may propound specific requests for information on corporate assets, and the corporate Defendants must provide accurate responses within 10 calendar days of receiving them.  The FTC shall review the information and then meet and confer with Defendants to agree upon an order that will take the place of this paragraph of the injunction.  The agreed order should prevent dissipation of assets while permitting the Defendants to continue legitimate business activities.  If the parties are unable to stipulate to such an order, the FTC shall move promptly for such an order.  The provisions of this paragraph shall have no effect after 5:00 p.m. on April 30, 2006, absent an order from the court stating otherwise.

Dated this 3rd day of April, 2006.

JAMES L. ROBART
United States District Judge